## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| THE CITY OF GOODLETTESVILLE, TENNESSEE, on behalf of themselves and all similarly situated taxing authorities within the State of Tennessee, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | **Case No. 3:08-cv-00561** |
| v. | ) ) | |
| | ) | **Judge Aleta A. Trauger** |
| PRICELINE.COM, INC.; LOWEST FARE.COM, INC.; TRAVELWEB, LLC; TRAVELOCITY.COM, INC.; TRAVELOCITY.COM, LP; SITE 59.COM, LLC; EXPEDIA, INC.; HOTELS.COM, LP HOTWIRE, INC.; TRAVELNOW.COM, INC. TRIP NETWORK, INC. (d/b/a CHEAPTICKETS, INC.); and ORBITZ, LLC, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

In this class action for which the City of Goodlettesville, Tennessee ("City"), serves as the party plaintiff, the parties have filed cross-motions for summary judgment. The defendants filed a joint Motion for Summary Judgment (Docket No. 299), which the City opposed (Docket No. 347), and the defendants filed a joint Reply (Docket No. 366). The City also filed a Motion for Summary Judgment (Docket No. 302), which the defendants jointly opposed (Docket No. 351), and the City filed a Reply (Docket No. 369). For the reasons stated herein, the defendants' Motion for Summary Judgment will be granted and the City's Motion for Summary Judgment will be denied.

## BACKGROUND

1

I.    **Procedural History**

The City and the other class members are political subdivisions of the state of Tennessee.

The defendants ("Defendants"), which include Priceline.com, Inc., Travelocity.com, L.P.,

Expedia, Inc., and Orbitz Worldwide, Inc., as well as certain subsidiaries and corporate siblings

of these entities, all do business as online travel companies ("OTCs").

On June 2, 2008, the City filed a class action Complaint,[1] broadly alleging that the

Defendants had failed to remit hotel occupancy taxes to the City and other local taxing

authorities.  (Docket No. 1.)  The Complaint asserted claims for violation of the Goodlettesville

City Code, unjust enrichment, and conversion.  (*Id.*)  The Defendants then filed a Motion to

Dismiss, which the court denied.  *City of Goodlettesville, Tenn. v. Priceline.com, Inc.*, 605 F.

Supp. 2d 982 (M.D. Tenn. 2009).  Thereafter, the court granted the City's motion for class

certification.  *City of Goodlettesville, Tenn. v. Priceline.com, Inc.*, No. 3:08-CV-0561, 2011 WL

1595847 (M.D. Tenn. Apr. 27, 2011).[2]  The City then voluntarily dismissed with prejudice the

claims for unjust enrichment and conversion.  (Docket No. 290.)  The City now seeks damages

on behalf of itself and the class members only for alleged hotel occupancy tax code violations.

_____

[1]The City of Brentwood, Tennessee, originally joined the City of Goodlettesville as a party plaintiff in the Complaint.  The parties then stipulated to the voluntary dismissal of the City of Brentwood.  (Docket No. 59.)

[2]The court certified a class of municipalities and counties that includes "Plaintiff and all other political subdivisions within the State of Tennessee that impose a tax upon the privilege of occupancy in any hotel, tourist camp, tourist cabin, tourist court, motel, or any other place in which rooms, lodgings or accommodations are furnished to transients for a consideration." (Docket No. 209.)  The parties thereafter filed an agreed-upon list of class members, which includes 73 counties and 56 municipalities within Tennessee.  (Docket No. 359, Ex. 2.)

2

The parties have submitted various legal and factual materials in support of their positions.[3]

## II.   **Factual Background**

### (A)   The Merchant Model

OTCs generally offer services to hotels[4] under one of two different business models: the "Agency Model" and the "Merchant Model."  Under the Agency Model, an OTC functions as a hotel's agent, facilitating consumer bookings at the hotel, charging a service fee to the hotel and, sometimes, charging a service fee to the consumer as well.  In this model, the hotel sets the price of the room paid by the consumer, the hotel is listed as the merchant of record on the transaction with the consumer, and the hotel is paid the full consideration for the room reservation by the consumer directly.

---

[3]In support of the Defendants' motion, the Defendants filed a supporting memorandum (Docket No. 339), a Statement of Undisputed Facts (Docket No. 325), copies of unpublished cases (Docket No. 340), and 18 exhibits (Docket Nos. 301, 305, 311, 313, 327, 333, 314, 316-318, 334, 319, 321-324, and 336-37).  In opposition, the City filed a Memorandum of Law (Docket No. 347), a Response to Defendants' Statement of Facts and Plaintiffs' Statement of Additional Facts (Docket No. 348), and the Declaration of Andrew M. Volk (Docket No. 349), which attached 81 exhibits (Docket Nos. 349-350 and 352-355).  The Defendants then filed a Reply (Docket No. 366), a Response to Plaintiff's Statement of Additional Facts and Reply in Support of Defendants' Statement of Undisputed Material Facts (Docket No. 365), and an appendix of eight exhibits (Docket No. 367).  In support of the City's motion, the City filed a Memorandum (Docket No. 309), a Statement of Material Facts (Docket No. 310), and a Declaration of Andrew M. Volk (Docket No. 304), which attached 132 exhibits (Docket Nos. 304, 306-307, 312, 315, 326, 328-332, 335, and 338).  In opposition, the Defendants filed a Memorandum of Law (Docket No. 351), a Response to Plaintiff's Statement of Facts (Docket No. 344), and an appendix of 29 exhibits (Docket No. 345).  The City then filed a Reply. (Docket No. 369.)  As concerns factual material, except to the extent these materials have not been presented in an admissible form under Fed. R. Civ. P. 56, the court has considered them in resolving the motion.

[4]OTCs handle bookings for other forms of overnight lodging as well, such as motels or inns.  For purposes of this Memorandum, the court will refer to these forms of lodging collectively as "hotels."

3

By contrast, under the "Merchant Model," which is the subject of this lawsuit, an OTC contracts with a hotel to pay a contractually agreed upon room rate to the hotel – a wholesale rate or "net rate" – for each room that customers ultimately book through the OTC. Contractually, the OTC is permitted to include information about the hotel on its website (positive or negative) and to allow consumers to reserve rooms through the website. The OTC does not purchase or take title to any rooms, nor is any payment made to the hotel before a booking is made. Thus, the OTC has neither possession nor control of the hotel rooms before a reservation is made.[5] However, once a reservation is made through an OTC's website for a particular hotel, the hotel must honor that reservation. The City concedes that, even after a booking is made, the OTC does not have possession of the room, although it disputes whether the OTC exercises "control" over the room after the booking. The OTCs do not suffer any penalties for failing to book rooms.

The contracts between OTCs and hotels typically provide the hotel some discretion to change both the discounted rate it charges the OTC for any bookings and the number of reservations it will allow the OTC to book for a given night. However, this discretion is often subject to special limitations, such as a "base allocation" (*e.g.*, 10 rooms per night minimum must be available for the OTC to book during a specified period), a "most favored nation" provision (if any company is selling rooms on behalf of the hotel, the OTC must be afforded the same right), and "last room availability" (any unbooked rooms must be made available for booking under certain circumstances). Furthermore, the contracts often provide for a minimum

---

[5]As discussed herein at pp. 14-16, the Complaint alleged that the OTCs "purchase and take title to hotel rooms" before re-letting them to consumers. The factual record demonstrates that not to be the case.

4

markup margin to the OTC relative to the hotel's published rates. For example, a contract might provide that the net rate for a Merchant Model booking must be no more than X% below the hotel's published rates for that day, thereby affording the OTC the ability to make at least that X% differential on any bookings at a rate equivalent to the hotel's published rates.[6] Some contracts also provide that the OTC may not "undercut" a hotel's public rates.

The OTC markets the hotel's rooms on the OTC's website. The OTC sets the (higher) retail rate for the room by adding its markup to the discounted rate. Unless the contract with the hotel provides otherwise, the OTC may set the retail rate at its discretion. In any case, the built-in markup that an OTC adds to the net rate provides its profit margin on each Merchant Model transaction.

Once a consumer has identified a hotel room on an OTC's website that the consumer intends to book, the consumer typically is presented with three line items: the room price, a combined charge for "taxes and service fees" (or roughly equivalent language), and the combined total price. The "taxes and fees" line item reflects a combination of (1) taxes assessed on the undisclosed *net rate* and (2) an embedded "service fee" that accrues to the OTC, which essentially constitutes a portion of the markup. The OTCs combine the service fee and taxes into one line item to preserve the opacity of the markup and the underlying net rate.[7]

To make a reservation, the consumer must accept the OTC's terms and conditions, which

_____

[6]For the sake of preserving the confidentiality of the OTCs' pricing schemes, the court will utilize generalized or hypothetical figures that are not intended to reflect any actual pricing figures filed under seal with the court.

[7]If the tax charge were separately itemized, the public could determine the underlying (and otherwise confidential) net rate between the OTC and the hotel by simple arithmetic.

5

include a cancellation policy that typically incorporates the underlying hotel's cancellation policies and, in some instances, may add additional cancellation provisions specific to the OTC. If the consumer accepts the reservation subject to these terms and conditions, the OTC charges the consumer's credit card. Once the room is booked, the hotel is obligated to honor the consumer's booking. The OTCs provide a room confirmation and room receipt to the consumer. The consumer does not receive a rental receipt from the hotel prior to checking in. The consumer does not need to pay any additional amount to the hotel for the right to stay at the hotel. If the consumer wishes to cancel the reservation, the consumer typically must contact the OTC in the first instance.

When the consumer arrives at the hotel, the hotel chooses which specific room to assign that consumer, arranges for payment of any incidentals, and provides room access. Around the time of check-in or soon after, the hotel then invoices the OTC for the consumer's stay. That invoice typically includes line items for (1) the net rate for the booking; and (2) the applicable hotel occupancy taxes assessed relative to that net rate. Then, pursuant to its agreement with the hotel, the OTC remits payment to the hotel for the total of both of these charges. The hotel then remits the occupancy tax revenue (assessed against the net rate that it received for the booking) to the taxing authority. Ultimately, the OTC retains the full value of its markup – effectively, the retail rate less the discounted rate – which is not taxed. This mode of business is referred to as the "Merchant Model" because the OTC – not the hotel – serves as the merchant of record in the transaction with the consumer.

To illustrate the mechanics of these transactions with numbers, assume that an OTC agrees with a hotel on a net rate per room of $100 and that the applicable local hotel occupancy

tax is 3%, as it is under the Tax Ordinance at issue here.  If the OTC markets the room for a retail rate of $150 (*i.e.*, builds in a $50 markup for its services) and the consumer accepts that rate, the OTC would bill the consumer for $150 plus 3% of *$100* – the underlying net rate – or $3.00, for a total of $153.00.  When the hotel later invoices the OTC on or about the date of check-in, the OTC sends the hotel $103.00, and the hotel ultimately remits $3.00 to the City, reflecting 3% of the consideration the hotel received for the booking.  By contrast, if a consumer made the same booking directly through the hotel for $150, the hotel would charge the consumer $150 plus 3% of *$150*, or $4.50, for a total of $154.50.  The hotel would then remit $4.50 to the City, reflecting 3% of the consideration the hotel received for that booking.  Thus, under these circumstances, even though the consumer pays the same underlying rate of $150 to make the reservation, under the Merchant Model the City receives $1.50 less than if the consumer booked the room directly with the hotel.  From the City's perspective, that $1.50 difference represents a revenue shortfall for which the OTCs are liable.

(B)     Functions Not Performed by OTCs

The OTCs do not physically possess or take title to any hotels, hotel rooms, or other hotel-related physical structures within Tennessee; they do not perform any direct oversight of day-to-day hotel operations, such as housekeeping, maintenance of hotel grounds, room service, front desk operations, or building security; they do not physically provide possession of any hotel rooms to consumers; and they do not assign the particular room in which a consumer may stay for a given booking.  All of these functions relate to the hotel itself, not an OTC.  Thus, there is no dispute that OTCs perform no day-to-day "brick and mortar" hotel functions.

(C)     The Applicable State and Local Laws

7

The Tennessee Legislature authorized political subdivisions to enact a "Tourist Accommodation Tax" on hotel occupants. Tenn. Code Ann. §§ 7-4-101 to -112 (the "Enabling Act"). Pursuant to the Enabling Act, the City enacted a "Hotel-Motel Tax," (hereinafter "Tax Ordinance"). *See* Goodlettesville City Code ("City Code") §§ 5-501 to -510 (found at Docket No. 107).[8] In relevant part, the Tax Ordinance states as follows:

> **5-502. Tax Levied**. There is hereby levied, assessed and imposed, and shall be paid and collected, a privilege tax upon the privilege of occupancy in any hotel of each transient in an amount equal to three percent (3%) of *the consideration charged by the operator*. Such tax is a privilege tax upon the transient occupying such room and is to be collected as provided herein.
>
> **5-503. Collection; refund or credit**. Such tax shall be added by each operator to each invoice prepared by the operator for the occupancy in his hotel to be given directly or transmitted to the transient and shall be collected by such operator from the transient and remitted to the City of Goodlettesville.

(*Id.* at §§ 5-502 and -503 (emphasis added).) This language is essentially identical to the parallel authorization language in the Enabling Act. *See* Tenn. Code Ann. §§ 7-4-102(a)(1) and -103.

The Tax Ordinance also defines many of the terms referenced in the aforementioned provisions, as follows:

> **5-501. Definitions**. As used in this chapter unless the context otherwise requires:
>
> (1)     "Consideration" means the consideration charged, whether or not received, for the occupancy in a hotel valued in money whether to be received in money, goods, labor or otherwise, including all receipts, cash,

---

[8]The Enabling Act was passed in 1976 and originally applied only to certain political subdivisions. In 1988, the Legislature enacted a second Enabling Act authorizing "home rule" jurisdictions to enact hotel occupancy taxes under substantively identical limiting language. *See* Tenn. St. Ann. 67-4-1401 *et seq.*; 1988 Tenn. Pub. Acts c. 982, § 3. In March 1990, the Legislature then added § 7-4-102(c) to the original Enabling Act, thereby authorizing certain additional municipalities to levy hotel occupancy taxes. *See* 1990 Tenn. Pub. Acts c. 636, § 3. The Goodlettesville Tax Ordinance was passed in July 1990 in accordance with § 7-4-102(c). (Docket No. 10, Ex. B (certified copy of original ordinance).)

credits, property and services of any kind or nature without any deduction therefrom whatsoever . . . .

(2)     "Hotel" means any structure or any portion of any structures [sic] which is occupied or intended or designed for occupancy by transients for dwelling, lodging or sleeping purposes and includes any hotel, inn, tourist camp, tourist cabin, tourist court, motel, or any place in which rooms, lodgings or accommodations are furnished to transients for a consideration.

(3)     "Occupancy" means the use or possession or the right to the use or possession of any room, lodging or accommodations in any hotel.

(4)     "Operator" means the person operating the hotel whether as owner, lessee, or otherwise;

(5)     "Person" means any individual, firm, partnership, joint venture, association, social club, fraternal organization, joint stock company, corporation, estate, trust, receiver, trustee, syndicate or any other group or combination acting as a unit.

. . .

(7)     "Transient" means any person who exercises occupancy or is entitled to occupancy for any rooms, lodging or accommodations in a hotel for a period of less than ninety (90) continuous days.

These definitions are, in relevant part, identical to those set forth in the Enabling Act.  *See* Tenn. Code Ann. § 7-4-101(a), at (1) ("Consideration"), (4) ("Hotel"), (5) ("Occupancy"), (6) ("Operator"), (7) ("Person"), and (11) ("Transient").  Because the City Code provisions are essentially identical to those set forth in the Enabling Act, it appears that the City exercised the full grant of taxing authority afforded it by the Legislature.[9]

---

[9]Tennessee municipalities have only the power to tax granted by the State. *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 156 (Tenn. 1993) ("[L]ocal governments have no power to tax absent legislative delegation of that power."); *Memphis Union Station Co. v. City of Memphis*, 30 S.W.2d 240, 242 (Tenn. 1930) ("The power of a [city] to impose taxes is dependent upon legislative authority . . . .").  Thus, the City's power to impose hotel occupancy taxes here is limited to the grant of authority from the Tennessee Legislature in the Enabling Act.

9

(D)    The Parties' Arguments

The Defendants argue that the markup is not taxable under the Tax Ordinance, chiefly because OTCs are not "operators" of the hotels.  The Defendants also assert that, even if the markup is otherwise taxable under the Tax Ordinance, imposition of hotel occupancy taxes on the retail rate would violate the Commerce Clause, the Equal Protection Clause, and the Due Process Clause of the United States Constitution, as well as the Internet Tax Freedom Act ("ITFA"), Pub. L. 105-277, div. C. tit. XI, § 1101(a)(2), as amended (codified at 47 U.S.C. § 151 note).  By contrast, the City argues that the Tax Ordinance applies to the retail rate because the OTCs are hotel "operators," and that imposition of the tax does not violate federal constitutional or statutory law.

## ANALYSIS

## I.    Summary Judgment Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2011).  At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case.  *Id.* (citing *Celotex*, 477 U.S. at 325).  "When the moving party has carried this burden, 'its opponent must do more than simply

show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).)  The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).  But "[t]he  mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249.  An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

Under Tennessee law, the interpretation of a statute is a "question of law," and where a case "involves a matter of law and there are no genuine issues of material fact, [it] is an appropriate case for summary judgment." *Home Builders Ass'n of Middle Tenn. v. Williamson Cnty.*, 304 S.W.3d 812, 816-17 (Tenn. 2010); *see also State ex. rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 533 (Tenn. 2004); *Mullin v. Hartford Accident and Indem. Co.*, No. 3:04-CV-525, 2005 WL 1429305, at *2 (E.D. Tenn. June 17, 2005) (applying Tennessee law).  Here,

11

although the parties dispute the appropriate characterization of certain facts – as reflected in their robust statements of fact and responses thereto – the parties generally agree that there are no genuine disputes of material fact and that, therefore, the matter is suitable for disposition on summary judgment. (*See* Docket No. 374 ¶ 4; Docket No. 299 at p. 2; Docket No. 303 at p. 10.)

## II.    Rules of Statutory Construction

In construing a statute, a court's duty is "to ascertain and give effect to the intention and purpose of the legislature." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). The court "must look to the entire statute in order to avoid any forced or subtle construction of the pertinent language." *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn. 1994). "When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Eastman*, 151 S.W.3d at 507. However, "[w]here an ambiguity exists, we must look to the entire statutory scheme and elsewhere to ascertain the legislative intent and purpose." *Id.*

The court must "lean in favor of the construction which will render every word operative, rather than one which may make some idle or nugatory." *City of Oak Ridge v. Morgan*, 381 S.W.2d 901, 907 (Tenn. 1964) (internal quotation marks omitted). Also, under the principle of *ejusdem generis*, general words that follow specific words are construed as applying to the same class or kind of items as the specific words that precede them. *Sallee v. Barrett*, 171 S.W.3d 822, 829 (Tenn. 2005) ("Where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated."); *Lyons*, 872 S.W.3d at 897. Furthermore, under the principle of *noscitur*

12

*a sociis*, the meaning of "questionable or doubtful" terms is ascertained by reference to the

meaning of other associated terms. *Sallee*, 171 S.W.3d at 828-29.

Ultimately, the court is bound to effectuate the words of the statute, regardless of its

policy judgments:

> [C]ourts are not at liberty to depart from the words of the statute . . . [I]f the words
> of the statute plainly mean one thing they cannot be given another meaning by
> judicial construction . . . . Finally, it is not for the courts to alter or amend a
> statute. Moreover, a court *must not question the reasonableness of a statute or
> substitute its own policy judgments for those of the legislature.* Instead, courts
> must presume that the legislature says in a statute what it means and means in a
> statute what it says there. Accordingly, courts must construe a statute as it is
> written.

*Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000) (emphasis added)

(internal quotations and citations omitted).

Additional considerations apply to matters involving taxation. "[R]evenue acts [are not]

to be interpreted so as to extend their provisions by implication beyond the clear import of the

language used, or to enlarge their operations so as to embrace matters not specifically pointed

out." *Gallagher v. Butler*, 378 S.W.2d 161, 169 (Tenn. 1964); *Sanborn v. McCanless*, 178

S.W.2d 765, 770 (Tenn. 1944). Thus, revenue acts "are to be construed *most strictly against the

State* and *in favor of the citizen.*" *Sanborn*, 178 S.W.2d at 770 (emphases added); *accord

Eastman Chem.*, 151 S.W.3d at 507 ("Statutes imposing a tax are to be construed strictly against

the taxing authority."); *Covington Pike Toyota, Inc. v. Cardwell*, 829 S.W.2d 132, 135 (Tenn.

1992) ("Taxation statutes must be liberally construed in favor of the taxpayer and strictly

construed against the taxing authority."). Thus, "[w]here there is doubt as to the meaning of a

taxing statute, the doubt must be resolved in favor of the taxpayer." *Home Builders*, 304 S.W.3d

at 817 (internal quotation marks omitted).

However, even with respect to tax statutes, the court "must, if possible, interpret the statute and the words used therein in a manner that will carry out the legislative intent and in such a manner that the purpose of the legislation will not be defeated." *Wachovia Bank of N.C., N.A., v. Johnson*, 26 S.W.3d 621, 627 (Tenn. Ct. App. 2001). Accordingly, the court should reject an interpretation that "could render the tax statute a virtual nullity. Courts must presume that the legislature did not intend an absurdity and adopt, if possible, a reasonable construction which provides for a harmonious operation of the laws." *Id.*

## II.    The Legal and Factual Record Now Before the Court

This court's Memorandum on the Motion to Dismiss is the only decision addressing the application of the Enabling Act and Tax Ordinance to OTCs.[10] *See Goodlettesville,* 605 F. Supp. 2d 982.[11] Although the City contends that the *Goodlettesville* opinion essentially dictates summary judgment in the City's favor, the facts and legal precedent developed after *Goodlettesville* require further analysis of the Tax Ordinance's applicability to OTCs.

### (A)    Motion to Dismiss

Taking the City's allegations as true and applying then-existing legal precedent, this court originally found that OTCs could constitute "operators" under the Tax Ordinance and that, therefore, the consideration received by the OTCs from consumers (*i.e.*, the retail rate)

---

[10]Although the parties have cited myriad decisions by state courts, federal courts, and certain administrative bodies concerning the applicability of hotel occupancy taxes to OTCs, none of those decisions involves the precise statutory language at issue here, none involves the application of Tennessee law, and only a handful address what it means to "operate" a hotel. Although the reasoning behind some of these decisions is persuasive, none of them is controlling.

[11]Unless otherwise noted, references herein to the *Goodlettesville* matter relate to this court's opinion denying the Motion to Dismiss at 605 F. Supp. 2d 982.

14

constituted the taxable "consideration charged by the operator." *Id.* at 993-97. In reaching that decision, the court relied on the City's allegation that each defendant OTC "purchases and takes title to inventories of hotel rooms," using its own credit card, and then "re-sells the rooms to consumers." (Docket No. 1 ¶ 28; *Goodlettesville*, 605 F. Supp. 2d at 993-995.) In particular, when the court applied the doctrine of *ejusdem generis* to the Tax Ordinance definition of "operator," which encompasses "any person operating the hotel as owner, lessee, or otherwise," the court rejected the Defendants' argument that they lacked any possessory interest in the rooms they market as "disingenuous and contrary to the facts pleaded in the Complaint." *Goodlettesville*, 605 F. Supp. 2d at 995. Accordingly, the court found that the OTCs' interests in hotel rooms were "sufficiently similar to the possessory interest of an owner or lessee" to fall within the general "otherwise" term. *Id.*

In interpreting the statutory language, this court distinguished *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 313-14 (4th Cir. 2009), in which the Fourth Circuit had held that OTCs did not constitute "operators" under a North Carolina tax statute, and *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, No. 3:06-CV-480-R, 2008 WL 4500050, at *4-*5 (W.D. Ky. Sept. 30, 2008) (hereinafter "*Louisville/Jefferson I*"), in which a district court had held that OTCs are not "like or similar accommodations businesses" to hotels under a Kentucky statute. *See Goodlettesville*, 605 F. Supp. 2d at 995-996 (distinguishing *Pitt Cnty.* and *Louisville/Jefferson I*). This court also found the reasoning of three other district courts that had ruled against the OTCs to be more compelling, including *City of Charleston, S.C. v. Hotels.com, LP*, 520 F. Supp. 2d 757 (D.S.C. 2007), *City of Fairview Heights v. Orbitz, Inc.*, No. 05-CV-840-DRH, 2006 WL 6319817 (S.D. Ill. July 12, 2006), and *City of San Antonio v. Hotels.com*, Civil

15

No. SA-06-CA-381-OG, 2007 WL 1541184 (W.D. Tex. Mar. 20, 2007) (hereinafter *"City of San Antonio I"*). *See Goodlettesville*, 605 F. Supp. 2d at 996-97 (discussing *City of Charleston*, *City of Fairview Heights*, and *City of San Antonio I*.)

(B)     Factual Record

Contrary to the allegations set forth in the Complaint, the evidence demonstrates that OTCs do *not* purchase or take title to hotel rooms and do not pay the hotels before a booking is made. Instead, the evidence shows that OTCs contract for the right to market an allotment of rooms, in return for the hotel's promise to reimburse the OTCs at the negotiated net rate for any rooms sold, with no payments made until after a booking occurs and with no penalty for unsold rooms. Although the agreements between the OTCs and the hotels plainly permit the OTCs to bind the hotels to honor OTCs' transactions with consumers, the measure of "virtual control" exercised by the OTCs is appreciably more limited than the level of control alleged in the City's Complaint. In particular, although the Complaint alleged that the Defendants maintained a possessory interest in the hotel rooms marketed through their websites – which interest the court found to be sufficiently equivalent to the interest of a hotel "owner" or "lessee" for purposes of the Tax Ordinance – discovery shows that not to be the case.[12]

_____

[12]The City argues that, notwithstanding the underlying contractual relationships, the OTCs and their officers previously made "binding admissions" concerning the nature of the Merchant Model that the OTCs now seek to avoid through litigation-driven changes to their nomenclature concerning that model. The City points out that, in certain public filings and other scattered statements, the OTCs or their representatives previously described the Merchant Model as "selling" an "inventory" of rooms (or roughly equivalent terms). Then, after localities sought to enforce hotel occupancy taxes on OTCs, the OTCs switched to using terms such as "facilitating bookings," "acting as an intermediary" for hotels, and the like. Similarly, the City argues that, pre-litigation, the OTCs referred to the tax charges as "taxes," then, post-litigation, began referring to them as "tax recovery charges." The City suggests that these changes in nomenclature seek to disguise the true nature of the Merchant Model and, therefore, reflect an

16

(C)     Subsequent Legal Precedent

In addition, the legal landscape has changed since this court decided the Motion to

Dismiss, in a manner that impacts the court's analysis of the Tax Ordinance and its application to

OTCs.

(1)     Sixth Circuit Decision in *Louisville/Jefferson County*

In *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com*, 590 F.3d 381 (6th Cir. 2009)

("*Louisville/Jefferson II*"), issued some nine months after this court's *Goodlettesville* decision,

the Sixth Circuit affirmed the lower court's decision in *Louisville/Jefferson I* and endorsed its

reasoning.  The local hotel tax at issue applied to "the rent for every occupancy of a suite, room,

or rooms, charged by all persons, companies, corporations, or like or similar persons . . . doing

business as motor courts, motels, hotels, inns or like or similar accommodations businesses." *Id.*

at 383.  The district court, applying the doctrine of *ejusdem generis*, had determined that motor

courts, motels, hotels and inns shared the common characteristics of ownership or physical

control, meaning that "like or similar accommodations businesses" applied only to entities

sharing either of those characteristics.  *Id.* at 384.  Accordingly, the district found that OTCs

_____

acknowledgment that the Merchant Model transactions are subject to taxation at the retail rate.
For their part, the Defendants argue that the court should interpret the Merchant Model in
accordance with their more recent nomenclature.  The court is not persuaded by either line of
argument.  The contractual relationships among consumers, OTCs, and hotels – and the
applicability of the Enabling Act and Tax Ordinance thereto – are what they are, regardless of
the parties' pre- and post-litigation characterizations.  Thus, the reality of how OTCs conduct
business will control.  *See City of Philadelphia v. City of Philadelphia Tax Review Bd*, No. 216
C.D.2011, 2012 WL 310874, at *5 n.11 (Pa. Commw. Ct. Feb. 2, 2012) ("Expedia's use of
language that it 'sells' hotel rooms in older filings with [the SEC] and in advertisements is not
controlling and does not reflect the reality of how Expedia actually conducts it business.
Expedia presented substantial evidence . . . reflecting the manner in which it conducts its
business.").

17

were not "like or similar accommodations businesses" because they exercised neither ownership

nor physical control of the rooms they offered for rent. *Id*. On appeal, the Sixth Circuit agreed

with the district court's reasoning. *Id*. at 385-90. It agreed that the "plain meaning" of the

statutory language was inconclusive with respect to OTCs, and that, therefore, the application of

traditional canons of statutory construction, including *ejusdem generis*, were required to

determine its proper meaning. *Id*. at 387-88. The Sixth Circuit then held that the district court

had appropriately applied the doctrine of *ejusdem generis* in ruling for the OTCs. *Id*. at 388.

In support of its decision, the Sixth Circuit approvingly discussed the Fourth Circuit's

reasoning and ultimate holding in *Pitt County*. *See Louisville/Jefferson II*, 590 F.3d at 388

(discussing *Pitt County*). In *Pitt County*, the North Carolina hotel tax provision at issue applied

to "*[o]perators* of hotels, motels, tourist homes, tourist camps, and similar type businesses." 553

F.3d at 311-12 (emphasis added). Applying the doctrine of *ejusdem generis*, the Fourth Circuit

observed that hotels, motels, tourist homes, and tourist camps "are all physical establishments

with rooms or other accommodations where guests can stay." *Id*. at 313. Thus, the court found

that "[a] business that arranges for the rental of hotel rooms over the internet, but that does not

physically provide the rooms, is not a business that is of a similar type to a hotel, motel, or

tourist home or camp." *Id*. As this court acknowledged in *Goodlettesville*, the *Pitt County*

ordinance was similar to that utilized in the Tax Ordinance at issue here, because its scope was

limited to "operators." *See Goodlettesville*, 605 F. Supp. 2d at 997.[13]

_____

[13]Subsequent to *Goodlettesville*, *Pitt Cnty.*, and *Louisville/Jefferson II*, other jurisdictions
have also found that OTCs do not "operate" hotels under the applicable hotel occupancy tax
statutes. *See St. Louis Cnty. v. Prestige Travel, Inc.*, 344 S.W.3d 708, 714 (Mo. 2011) (affirming
dismissal on basis that OTCs did not "operate" hotels, where hotel tax applied to "every person .
. . engaged in the business of operating a hotel or motel"); *City of Philadelphia*, 2012 WL

18

Furthermore, in *Louisville/Jefferson II*, the Sixth Circuit made several other important findings. First, it rejected the county's argument that excluding the OTCs from hotel taxes would create an "absurd result." 590 F.3d at 388-89. There, as argued by the City here, the county argued that it was "absurd" for the county to receive lower tax revenue from OTC Merchant Model transactions compared to direct hotel bookings, where the consumer paid the same effective rate to book the room in either case. *Id.* The Sixth Circuit acknowledged that district courts in other circuits had identified this as a potential "loophole" in the application of hotel occupancy taxes, specifically citing to *City of Charleston* and *City of Fairview Heights*. *Id.* In those decisions, the district courts had outlined hypothetical scenarios in which a hotel could evade paying full taxes by creating a shell company, selling rooms to that company at a nominal rate, and then using that company to book rooms at retail rates, for which the hotel would only owe occupancy taxes on the nominal rate it charged its shell company. *See Louisville/Jefferson II*, 590 F.3d at 388 (referencing *City of Charleston*, 586 F. Supp. 2d at 543, and *City of Fairview Heights*, 2006 WL 6319817, at *5). The Sixth Circuit rejected this logic, which this court had previously relied upon in *Goodlettesville*, for two reasons: (1) "the Kentucky General Assembly, not the court, is the proper entity to close any such potential loophole," *id.* at 388; and (2) "unlike in the hypotheticals set forth above, none of the OTCs here are under common ownership with the physical establishments that control the rooms." *Id.* at 389; *see also City of Bowling Green v. Hotels.com, L.P.*, No. 2010-CA-000825-MR, 2011 WL 1600505, at *2 (Ky.

---

310874, at *4-*5 (affirming trial court denial of city's appeal of local tax board conclusion that OTC was not subject to city hotel room rental tax, where tax applied only to "operators," defined as any persons who "maintain, operate, manage, own, have custody of, or otherwise possess the right to rent or lease overnight accommodations in any hotel to the public for consideration").

19

Ct. App. Apr. 29, 2011) (agreeing with *Louisville/Jefferson II* that Kentucky legislature, not a court, was responsible for remedying any "potential loophole" with respect to OTCs).[14]

Second, in the *Louisville/Jefferson II* decision, the Sixth Circuit cited to *Expedia, Inc. v. City of Columbus*, 681 S.E.2d 122 (Ga. 2009) – published post-*Goodlettesville* – as providing an example of language that *did* clearly apply hotel taxes to the retail rate charged by OTCs. 590 F.3d at 389 (discussing *City of Columbus*). There, the ordinance at issue expressly taxed the "charge to the public" for a room. *City of Columbus*, 681 S.E.2d at 128. Applying that language, the Georgia Supreme Court had found that, because "Expedia is not the end-consumer, is not a member of the public at large, and is not the occupant of the hotel room, the tax targets the full rate paid by the consumer." *Id.* The Sixth Circuit agreed with this reasoning but concluded that, as concerned the Kentucky statute at issue in *Louisville/Jefferson II*, "the lack of

_____

[14]The Fourth Circuit in *Pitt County*, whose logic the Sixth Circuit endorsed in *Louisville/Jefferson II*, reached a similar conclusion:

> [I]t seems to us preferable to accept the statute as written, leaving to the legislature the function of closing loopholes (if they exist). The loophole identified in *Fairview Heights*, if indeed it is a real one, may simply indicate that the North Carolina General Assembly failed to consider the tax consequences of a situation where hotel rooms are rented first at wholesale and later re-let at retail rates to consumers. On the other hand, the statute's language may be the result of the legislature's deliberate choice to limit the application of the sales tax to the actual operators of hotels and similar type businesses. In either case, we may not expand the statute's reach beyond what its plain language will bear.

553 F.3d at 314 (internal citations and quotations omitted). Other courts also have recently endorsed the same principles with respects to OTCs. *See, e.g.*, *City of Birmingham v. Orbitz, Inc.*, Civil Action No. CV 09-3607 JSV (Ala. Circuit Ct. Mar. 24, 2011) ("It is not a proper function of the courts to rewrite the law, even though it is clear that the State of Alabama and its cities are in desperate need of any revenue they can find. If the Alabama Legislature intends to impose a tax on the service rendered by the OTCs, and if it intends to allow the municipalities to impose such a tax, it may do so by appropriate legislation.") (Docket No. 340, Attach. 2).

equivalent language in the ordinances before us leads us to the opposite result.  In other words, imposing the transient room tax based on 'the charge to the public' *provides clarity that is sorely lacking in the ordinances at hand.*"  590 F.3d at 389 (emphasis added).

Finally, the Sixth Circuit observed that, under Kentucky law, if the meaning of a tax-related provision is not "explicitly and distinctly revealed . . . it is the function of the judiciary to construe the statute strictly and resolve doubts and ambiguities in favor of the taxpayer and against the taxing powers."  *Id.* (quoting *George v. Scent*, 346 S.W.2d 784, 789 (Ky. 1961)).  Concluding that "the counties' interpretation of the ordinances in question is at best doubtful," the Sixth Circuit found that it was "obligated . . . to resolve the doubt 'in favor of the taxpayer,' *i.e.*, the OTCs." *Id.* at 389.[15]

(2)     *City of San Antonio* and *City of Houston* Decisions

In *City of San Antonio I*, a federal district court had found that, as alleged by the city, there was at least a question of fact as to whether OTCs exercised "control" under a hotel occupancy tax applying to any entity "owning, operating, managing or controlling any hotel." 2007 WL 1541184, at *2-*3.  Subsequent to the *Goodlettesville* decision, the *City of San Antonio* court tried this factual issue to a jury, which found that the OTCs were "controlling hotels" under

_____

[15]As discussed above at pp. 13-14, Tennessee has a similar standard with respect to tax statutes.  Several other jurisdictions have also applied similar standards in favor of the OTCs. *See, e.g.*, *Pitt Cnty.*, 553 F.3d at 314 (applying similar principles of North Carolina law and finding that, "[e]ven if we were to decide that the phrase 'similar type businesses' . . . is ambiguous as to its applicability to online travel companies, the County would still not prevail."); *St. Louis Cnty.*, 344 S.W.3d at 714 ("[E]ven if it were determined that this statute is ambiguous as to who is subject to the tourism tax, the tax is to be construed against the taxing authority.  Taxes are not to be assessed unless they are expressly authorized, and [plaintiffs] have failed to demonstrate that the tourism tax clearly imposed a liability on [the defendant OTC].")

21

the statute.  *See City of San Antonio v. Hotels.com*, Civil No. SA-06-CA-381-OG, 2011 U.S. Dist. LEXIS 72665 (W.D. Tex. July 1, 2011) (hereinafter, "*San Antonio II*").  The court then resolved the remaining legal issues in favor of the city and granted summary judgment to the City and the class members on July 1, 2011.  *Id.*

More recently, on October 25, 2011, in *City of Houston v. Hotels.com, L.P.*, No. 14-10-00349-CV, 2011 WL 5045468 (Tex. Ct. App.), the Texas Court of Appeals reached the opposite conclusion.  The City of Houston, which had opted out of the *San Antonio* class action in favor of pursuing a separate lawsuit in state court, had enacted a hotel occupancy tax code substantially similar to that at issue in the *San Antonio* action.  Contrary to *San Antonio I* and *San Antonio II*, the Texas Appellate Court held that the ordinance taxed only the amount received by the hotels for room reservations, not the amounts paid by travelers to OTCs in the initial booking, and that there were no issues of material fact precluding summary judgment in the OTCs' favor.  *City of Houston*, 2011 WL 5045468, at *6-*9.  Following the *City of Houston* decision, the OTCs filed a motion for reconsideration in the *San Antonio* federal action, on which the district court has not yet ruled.[16]  Regardless of the disposition of that motion, the *City of Houston* decision at least undermines the persuasive value of the *San Antonio* court's holdings.

(3)      Impact of New Legal Precedent

The *Louisville/Jefferson II* decision and the *City of Houston* decision are particularly important to this court's consideration of the instant motion in several respects.  In sum, the

---

[16]The parties in that matter dispute whether the *City of Houston* decision is binding or otherwise merits reconsideration of the district court's judgment.

Sixth Circuit in *Louisville/Jefferson II*: (1) affirmed *Louisville/Jefferson I* and endorsed the reasoning of *Pitt County*, both of which this court had previously found to be unpersuasive; (2) rejected the reasoning of *City of Charleston* and *City of Fairview Heights*, two of three district court decisions that this court had found persuasive in resolving the Motion to Dismiss; (3) held that, at least with respect to the particular statute at issue, physical ownership or control of day-to-day operations were essential characteristics of a hotel business; (4) pointed to the post-*Goodlettesville* decision in *City of Columbus* as providing an example of clear statutory intent to tax the retail rate (levying a tax on the "charge *to the public*") (emphasis added), which language is absent here ("charged *by the operator*") (City Code §5-502) (emphasis added); (5) endorsed the principle, also held in Tennessee, that ambiguous statutes must be construed against the taxing authority in favor of the OTCs; and (6) held that, as other courts have also recently found, any perceived missed revenue opportunities relative to OTCs are for a state legislature to address, not the courts. Additionally, the *City of Houston* decision at least called into question, and perhaps abrogated, the third district court decision on which this court had previously relied.

Although neither *Louisville/Jefferson* (Kentucky law), *Pitt County* (North Carolina law), or *City of Houston* (Texas law) are controlling here, they certainly call into question the persuasive weight that this court previously assigned to *City of Charleston*, *City of Fairview Heights*, *San Antonio I*, and other similarly reasoned cases. Furthermore, even if the court did not have the benefit of additional legal authority, including the persuasive *Louisville/Jefferson II* decision by the Sixth Circuit and the *Pitt County* decision that it endorsed, a fundamental allegation on which the court previously relied was not proven. In light of these considerations, the court must re-examine the language of the Tax Ordinance and its application to facts that

23

differ in important ways from the Complaint allegations.

      (D)    <u>Application</u>

As this court previously found, and as the parties appear to acknowledge, neither the Legislature nor the City could have contemplated the OTC Merchant Model, because the laws at issue were enacted before the internet age and before OTCs existed. *See Goodlettesville*, 605 F. Supp. 2d at 995; *see also supra*, n. 8. In particular, the OTC Merchant Model has created a situation in which the amount paid as consideration to the hotel owner for staying in a room (the net rate) is lower than the total amount paid by the consumer to book the room (the retail rate).

The Tax Ordinance imposes a three percent tax on "consideration charged by the operator." City Code § 5-502. An operator is "the person operating the hotel whether as owner, lessee, or otherwise."[17] *Id.* § 5-501(4). Giving § 5-502 its plain and ordinary meaning, only consideration that is "charged by the operator" is subject to taxation – that is, the words "by the operator" must be taken as modifying the term "consideration"; otherwise they constitute mere surplusage. *See City of Oak Ridge*, 381 S.W.2d at 907 (court should favor an interpretation that renders each word operative). Thus, the essential legal question is whether an OTC, transacting business under the Merchant Model, constitutes an "operator."

Under the Tax Ordinance, an "operator" is a "person operating the hotel whether as owner, lessee, or otherwise." City Code § 5-501(4). In other words, the operator is an entity that operates the hotel as its owner, as a lessee of the hotel property, or in some "otherwise" unspecified capacity. Under the doctrine of *ejusdem generis*, the court must apply the specific

---

      [17]As this court has already found, the definition of "person" contemplates that, under appropriate circumstances, more than one entity can operate a hotel "in combination acting as a unit." *Goodlettesville*, 605 F. Supp. 2d at 994 n.8.

24

terms ("owner" and "lessee") to determine the scope of the general term ("otherwise"). *See Sallee*, 171 S.W.3d at 829. As this court previously found, an owner or lessee has a form of possessory interest in the hotel, suggesting that the "otherwise" term incorporates the notion of possession or substantial possessory control of the hotel premises. *Goodlettesville*, 605 F. Supp. 2d at 995; *see also Louisville/Jefferson II*, 590 F.3d at 388; *Pitt Cnty.*, 553 F.3d at 313. Accordingly, an entity "otherwise" operating the hotel must have some form of possessory interest (or some equivalent interest) in the hotel property. Even so, it is still ambiguous as to what functions the entity with that possessory interest (or some similar interest) must perform to constitute "operation" of the hotel. Accordingly, the court must apply canons of statutory construction to determine the meaning of this term.

In the absence of a precise internal statutory definition, it is appropriate for the court to look to the dictionary definition of a term. *See Christenberry Trucking & Farm, Inc. v. F&M Mktg. Servs., Inc.*, 329 S.W.3d 452, 459 (Tenn. Ct. App. 2010). When used as a transitive verb, "operate" means "to put or keep working in operation," *Random House Dictionary* (2011), "to manage, direct, run, or pursue" and "to control the functioning of," *Collins English Dictionary* (10th ed. 2009), or "to put or keep in operation." *Merriam-Webster Online Dictionary*. As concerns hotels, those terms strongly suggest day-to-day management of the hotel property itself. The hotel management, whether it owns the hotel, leases it from its owner, or acts in some other capacity (as a licensee or franchisee, for instance), manages and directs the hotel's day-to-day operations and controls the hotel's physical structure at all times. With respect to the definition of "operation" as a form of "control," this court previously acknowledged that, under appropriate circumstances, a third party could conceivably "control" a block of rooms, such as by purchasing

25

and taking title to a section of the hotel. *See Goodlettesville*, 605 F. Supp. 2d at 995. However, under the facts established by the record, it is at best doubtful whether the OTCs in fact "control" hotel rooms under any dictionary definition of the term "operate." Thus, construing the term "operate" strictly against the City and in favor of the OTCs, as the court must, the court finds that the functions of the OTCs under the Merchant Model do not constitute "operation" of the hotel. *See Home Builders Ass'n of Tenn.*, 304 S.W.3d at 817; *Covington Pike Toyota,* 829 S.W.2d at 135.[18]

This interpretation is consistent with other provisions in the Tax Ordinance indicating that the "operator" necessarily has possession and/or physical control of the hotel premises. *See* City Code §§ 5-501(1) (defining hotel to mean "any *structure* or portion of any *structures*," which "includes any hotel, inn, tourist camp, tourist cabin, tourist court, model, or any *place* in which rooms . . . are furnished to transients for a consideration") (emphases added) and 5-503 (the operator shall prepare an invoice for "the occupancy in *his* hotel") (emphasis added).)

The City argues that this interpretation would nullify the "otherwise" term within the definition of "operator." That is plainly not the case. In addition to operating a hotel as an owner or as a lessee, an entity could operate a hotel as a franchisee or as a licensee, for instance. Under either of those circumstances, the "otherwise" term would have a reasonable meaning that comports with, but reaches further than, the terms "owner" and "lessee." The "otherwise" term

_____

[18]*See also Louisville/Jefferson II*, 590 F.3d at 388 (applying this principle and finding in favor of OTCs); *Pitt Cnty.*, 553 F.3d at 313 (applying this principle and finding that OTCs do not constitute "operators"); *St. Louis Cnty*, 344 S.W.3d at 714 (same). Also, in one of the decisions cited by the City, a federal district court denied the OTCs' motion to dismiss, distinguishing *Pitt County* precisely because the Florida county ordinance at issue was, unlike the statute at issue in *Pitt County*, "not limited to those who 'operate' hotels." *Cnty. of Monroe v. Priceline.com*, No. 09-10004, 2009 WL 4890664, at *3 (S.D. Fla. Dec. 17, 2009).

would thus apply to the entity or entities actually running the hotel premises, which is certainly a plausible and understandable interpretation of what it means to "operate" a hotel.[19]

Furthermore, this interpretation is consistent with § 5-502 of the Tax Ordinance, which specifies that only "consideration charged by the operator" is subject to the 3% occupancy tax. In a Merchant Model transaction, the operator of a given hotel – whether acting as owner, lessee, franchisee, licensee, or in some other equivalent capacity – in fact receives only the *net rate* as consideration for permitting a consumer to spend the night in a particular room. Accordingly, the hotel remits taxes only on the consideration it *actually received* for the booking – that is, the consideration charged by the operator.[20]

---

[19]The Defendants also argue that various Tennessee statutes concerning health and safety requirements at hotels and other lodging establishments reflect an assumption by the Legislature that "operation" entails some form of control over the day-to-day operations of a hotel. *See, e.g.*, Tenn. Code Ann. §§ 68-14-305(a) ("No person shall operate a hotel . . . who does not hold a valid permit"). However, as the City points out, because the statutes have distinct purposes and the Enabling Act and Tax Ordinance contain their own definition of "operate" (whereas the health and safety statutes do not), there is no compelling reason to interpret the term "operate" in the health statutes *in pari materia* with the use of that defined term in the Tax Ordinance. *See Wachovia*, 26 S.W.3d at 626.

[20]This interpretation also comports with other City Code provisions highlighted by the City. Section 5-503 specifies that the occupancy tax "shall be collected by such operator from the transient and remitted to the [City]." This provision does not require the operator to collect the tax directly from the consumer. Indeed, under the Merchant Model, the hotel collects the occupancy tax from the consumer *indirectly*: the OTC charges the customer for taxes due on the net rate, then remits that portion of the customer's payment in full to the hotel upon invoicing. Similarly, § 5-504 requires the hotel occupancy tax to "be remitted by all operators who lease, rent or charge for occupancy within a hotel," and requires the operator to "collect the tax from the transient at the time of the presentation of the invoice for such occupancy *whether prior to occupancy* or *after occupancy* as may be the custom of the operator . . . ." (emphases added.) Here, the hotels do charge for occupancy of rooms, and they accordingly remit taxes on the consideration they actually receive for a given booking, whether at published rates (for direct bookings) or at net rates (for OTC Merchant Model bookings). Furthermore, the hotel collects the applicable taxes from the consumer indirectly after the hotel presents an invoice for that amount to the OTC, usually at or soon after the check-in date, in compliance with § 5-504.

27

At best, the City's interpretation that the OTC Merchant Model constitutes "operation" of Tennessee hotels is questionable. The court is bound to construe the tax revenue statutes strictly against the City and in favor of the OTCs. *See Sanborn*, 178 S.W.2d at 770; *Eastman Chem.*, 151 S.W.3d at 507; *Home Builders*, 304 S.W.3d at 817. Thus, even to the extent the City offers a plausible alternative interpretation of the Tax Ordinance and its application to the OTCs, the court must rule in favor of the Defendants. *Home Builders*, 304 S.W.3d at 817; *see also Louisville/Jefferson II*, 590 F.3d at 389; *St. Louis Cnty.*, 344 S.W.3d at 714; *Pitt Cnty.*, 553 F.3d at 314.

Although the City is correct that, under Tennessee law, the court should not adopt a statutory interpretation that renders a revenue statute a "virtual nullity," *see Wachovia*, 26 S.W.3d at 627, the court's interpretation here has no such effect. Under the existing statutory framework, the City and the other class members have collected and will continue to collect substantial occupancy tax revenues on the consideration local hotels receive at the net rate. Furthermore, as several courts have found, it is not "absurd" for localities to collect tax revenue on the net rate. *See, e.g.*, *Louisville/Jefferson II*, 590 F.3d at 388-389; *Pitt Cnty.*, 553 F.3d at 314. The localities have received and will continue to receive occupancy tax revenues that are based on the actual consideration local hotels collect for rooms they let.

Moreover, the OTCs and the hotels are independent entities that negotiate in arms-length transactions. In those transactions, the hotel has every incentive to keep the net rate as high as possible and to reserve for direct booking as many rooms as it believes it can sell directly to consumers, without sacrificing any potential revenue to the OTCs. Thus, with the benefit of a developed factual record before it, the court agrees with the Sixth Circuit and other courts that

28

the "nightmare" "shell company" scenarios discussed in *City of Charleston* and *City of Fairview Heights* do not apply to the Merchant Model. Accordingly, the fact that the City and other political subdivisions receive less tax revenue for a Merchant Model booking than for a direct hotel booking has not and will not effectively nullify the hotel occupancy tax codes.

Finally, as the Sixth Circuit and many other courts have emphasized persuasively, it is ultimately the role of the state legislature to enact revenue statutes that clearly state the scope and application of the tax laws and, upon identifying any potential revenue shortfalls in their application, to address those perceived shortfalls by appropriate legislation. *Louisville/Jefferson II*, 590 F.3d at 388; *Pitt Cnty.*, 553 F.3d at 314; *Bowling Green*, 2011 WL 1600505, at *2; *City of Birmingham v. Orbitz, Inc.*, Civil Action No. CV 09-3607 JSV, at p. 6 (Docket No. 340, Attach. 2). Like the statute at issue in *Louisville/Jefferson II*, it appears that the Enabling Act and the local hotel occupancy tax codes promulgated thereunder have simply "failed to keep up with the times." 590 F.3d at 384. Thus, if the Tennessee legislature intends to permit its political subdivisions to tax the retail rate paid by consumers to the OTCs for hotel bookings, the legislature may do so through appropriate statutory language.[21]

## CONCLUSIONS

For the reasons stated herein, the Defendants' Motion for Summary Judgment will be granted and the City's Motion for Summary Judgment, filed on behalf of itself and the certified class, will be denied.

---

[21]Because the court has found that the hotel occupancy taxes have appropriately been assessed on the net rate within Tennessee, the court does not reach the Defendants' separate argument that the imposition of hotel occupancy taxes on the OTCs' markup, even if otherwise applicable, violates the U.S. Constitution and the ITFA.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

30